**[J-28-2020]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 38 WAP 2019 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court entered March 1, |
| | : | 2019 at No. 560 WDA 2018, |
| v. | : | affirming the Judgment of Sentence |
| | : | of the Court of Common Pleas of |
| | : | Mercer County entered October 30, |
| MICHAEL DWAYNE BAGNALL, | : | 2017 at No. CP-43-CR-0000419- |
| | : | 2015. |
| Appellant | : | |
| | : | SUBMITTED: April 16, 2020 |


**OPINION**


**JUSTICE BAER**                 **DECIDED: AUGUST 18, 2020**

This appeal tasks us with determining whether the Commonwealth of Pennsylvania, represented initially by the Mercer County District Attorney's Office (DA's Office) and later by the Pennsylvania Office of Attorney General (OAG), violated the due process rights of Michael Dwayne Bagnall (Appellant) under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny by failing to disclose a cooperation agreement between the DA's Office and a key witness in Appellant's murder prosecution.[1] The question arises under circumstances where the OAG assumed the prosecution of Appellant prior to trial

---

[1] In *Brady*, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.

due to a conflict of interest between the DA's Office and Appellant's defense counsel, and the OAG was never made aware of the existence of the agreement.

For the reasons that follow, we hold that under the facts presented, the OAG is imputed with knowledge of the agreement between the DA's Office and the key witness at Appellant's trial, and that, having satisfied all of the requirements for establishing a *Brady* violation, Appellant is entitled to a new trial. Because the Superior Court reached a contrary result, we respectfully reverse the judgment of that court.

This case stems from the killing of Jaylan West (Victim) between the evening of February 27, 2015, and the early morning hours of February 28, 2015. The incident occurred at the home of Appellant's sister in Farrell, Mercer County, where Appellant was celebrating his birthday at a party. Victim and Appellant's friend, John Gregory (Gregory), were among those in attendance. The party ended abruptly after an argument broke out about money that had allegedly been stolen from the residence. Sometime later, Victim returned to the home, and Appellant fatally shot him.[2] Gregory was the only witness to the shooting.

On May 11, 2015, the DA's Office filed a criminal information charging Appellant with first-degree murder, third-degree murder, persons not to possess firearms, and aggravated assault. As the matter progressed, Appellant repeatedly sought from the Commonwealth discovery materials related to the existence of any consideration that Gregory was receiving in exchange for his cooperation as a witness in this case. We detail the relevant portions of the discovery requests and the Commonwealth's responses.

---

[2] According to testimony at trial, Victim's return to the residence was spurred by accusations regarding who had taken the money.

On June 16, 2015, Appellant filed an informal request for discovery pursuant to Pa.R.Crim.P. 573(B), seeking any evidence favorable to him that was material to either guilt or punishment in the possession of the Commonwealth and specifically seeking any and all consideration that Gregory received in exchange for his cooperation.[3] Defendant's Informal Request for Discovery and Inspection, 6/16/2015, at ¶¶ 1, 34. Thereafter, on September 14, 2015, Appellant filed a formal request for discovery, alleging that the Commonwealth had failed to comply with Appellant's prior informal request and, in particular, had not provided materials relating to any consideration Gregory received in exchange for his cooperation, including letters of immunity. Defendant's Formal Request for Discovery and Inspection, 9/14/2015, at ¶ 2v., x. At a December 18, 2015, hearing held on that request, Assistant District Attorney (ADA) Tyler Heckathorn stated that he was not aware of any consideration or letters of immunity relating to Gregory's cooperation and that Gregory "received nothing in exchange for his cooperation." Transcript of Proceedings, Motion for Discovery and Inspection, 12/18/2015, at 4.

Following the hearing, the trial court issued an order directing that the parties review the requested discovery set forth in Appellant's request and that the Commonwealth turn over within 30 days any discovery materials that had not yet been

---

[3] Pa.R.Crim.P. 573(B) provides, in relevant part:

> (1) *Mandatory.* In all court cases, on request by the defendant, and subject to any protective order which the Commonwealth might obtain under this rule, the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case. The Commonwealth shall, when applicable, permit the defendant's attorney to inspect and copy or photograph such items.
>
> > (a) Any evidence favorable to the accused that is material either to guilt or to punishment, and is within the possession or control of the attorney for the Commonwealth[.]

Pa.R.Crim.P. 573(B)(1)(a).

provided to defense counsel. Order, 12/21/2015. On February 26, 2016, the DA's Office filed a response to Appellant's formal request for discovery where it again represented that "[n]o letters of immunity were ever given to Mr. Gregory" and that "[n]o such information" existed as to any consideration offered to Gregory in exchange for his cooperation. Prosecution's Response to Defendant's Formal Request for Discovery and Inspection, 2/26/2016, at ¶ 3v., x.

Following several continuances of the matter, by order filed February 14, 2017, the trial court disqualified Miles Karson, the Mercer County District Attorney, from the case due to a conflict of interest with defense counsel. In light of this conflict, the OAG assumed prosecution of the matter, with Deputy Attorneys General Patrick Schulte and Bobbi Jo Wagner from the OAG formally entering their appearance on behalf of the Commonwealth on April 3, 2017. In the interim, on February 16, 2017, Appellant filed another formal request for discovery, alleging that, as of that date, the Commonwealth had failed to provide Appellant with a letter of immunity executed by Gregory. Defendant's Formal Request for Discovery and Inspection, 2/16/2017, at ¶ 2a.

Also around this time, the DA's Office and Gregory were in the midst of plea proceedings regarding Gregory's unrelated criminal matter. While many details of these proceedings against Gregory are unclear from the record before us, it appears that they concerned a charge of accidents involving personal injury. Notwithstanding this lack of detail, the record does reveal that, in that matter, on March 7, 2017, ADA David Wenger agreed to Gregory receiving a probationary sentence, which was in the mitigated range of Gregory's sentencing guidelines, in exchange for his "cooperation [and] how he ha[d] turned his life around." *See infra* at page 11 (quoting N.T., 3/12/2018, at 48). As will be discussed further, this ambiguous reference to Gregory's "cooperation" is of substantial significance in this appeal.

Returning to Appellant's case, on June 1, 2017, the OAG filed a response to Appellant's discovery request, specifically referencing Appellant's initial June 16, 2015 discovery request seeking information relating to any consideration Gregory received in exchange for his cooperation. Notwithstanding ADA Wenger's representations in Gregory's underlying criminal matter noted above, the OAG explained that, "[a]fter a thorough review of the matter, including interviews of Mercer County District Attorney Miles Carson [*sic*], his staff, and John Gregory, it is the Commonwealth's position that the Mercer County District Attorney did not offer John Gregory any consideration as it relates to his testimony as a Commonwealth witness" in Appellant's case. Response to Discovery Request, 6/1/2017, at ¶¶ 3-4.

The OAG further represented in its response that it was "not in the possession or control of any cooperation agreement between John Gregory and the Mercer County District Attorney as it relate[d] to his testimony" in Appellant's case and that the OAG did not believe that a cooperation agreement existed. *Id.* ¶ 5. The OAG also indicated that it had not and would not "be offering a cooperation agreement or any consideration to John Gregory in exchange for his testimony as a subpoenaed witness in the trial" of Appellant's case. *Id.* ¶ 6. Thus, the OAG explained that it could not comply with Appellant's discovery request in that it had "a *bona fide* belief that the information requested does not exist." *Id.* at ¶ 7.

Appellant's jury trial began on August 21, 2017. While there was no dispute that Appellant shot and killed Victim, Appellant claimed that he acted in self-defense. Gregory was among the witnesses who testified on behalf of the prosecution. Gregory relayed that he and Appellant grew up together, were best friends, and Gregory thought of Appellant as his brother. N.T., 8/22/2017, at 54, 121.

Relevant to the night in question, Gregory testified that after the party had dispersed, Victim returned to the residence by walking through the back door into the kitchen, where Appellant, Gregory, and a few others were also situate. *Id.* at 72-73. Eventually, everyone but Appellant and Victim left the kitchen area. *Id.* at 73. Gregory testified that he had walked into the living room, which was connected to the kitchen via a foyer, and then heard "non-audible talking" followed by a gunshot. *Id.* at 73-74. He further stated that after he heard the gunshot, he ran to the entranceway of the kitchen and observed that:

> [Appellant] had his gun out shooting [Victim] in the chest and the torso or whatever. [Victim] kept having his hands over his chest and his stomach and was pleading to him, "If you let me live, I won't come back. I just want to live." I didn't see a gun in [Victim's] hand. He was pleading for his life. And every time [Victim] tried to make a way to go out the back door, it looked like [Appellant] took his free hand and kept pushing him in the middle of the room so he can keep shooting him.

*Id.* at 74-75. Gregory repeatedly testified that Victim did not have a gun at the time of the shooting, Victim begged for his life, and Appellant prevented Victim from retreating. *Id.* at 72, 75-76, 82-83, 103, 123. Gregory also indicated that Appellant was agitated, angry, and aggressive prior to the shooting in part because of the allegedly missing money, and that he was standing over Victim, though not directly, while shooting him. *Id.* at 57, 68, 72, 76.[4]

On cross-examination, Appellant's defense counsel, Stanley Booker, Esq., attempted to uncover whether Gregory had received any consideration in exchange for his trial testimony. As counsel began to ask Gregory about whether he had a pending criminal matter, the prosecution objected, and a conversation was held at sidebar. During

---

[4] This account corroborated the testimony of Michael Kelley, Appellant's former jail mate who, *inter alia*, testified that Appellant admitted to killing Victim and planned to claim self-defense, and reenacted the manner in which Appellant had told him the shooting occurred.

that conversation, defense counsel indicated that Gregory had a case that was continued for two years where he was "looking at" 18 months in prison at the least, but that the matter had been resolved and the Commonwealth recommended probation based on Gregory's cooperation in this case. *Id.* at 113-14. The attorneys for the Commonwealth, as represented by the OAG, denied that Gregory received a benefit in exchange for his cooperation in Appellant's case:

> MR. BOOKER:  I am going to ask him about the deal that he received in exchange for cooperating.  He was looking at 18 months in prison, he got -- based on the Commonwealth recommending probation, which is below outside [*sic*] the guidelines.  He got a benefit for testifying.
>
> MR. SCHULTE:  For testifying today?
>
> MR. BOOKER:  For testifying period, yes, for cooperating.
>
> MS. WAGNER:  At this case?
>
> MR. BOOKER:  Yes.
>
> MR. SCHULTE:  That's just not true.
>
> MS. WAGNER:  That's just not true.
>
> MR. BOOKER:  It is true.  If you look -- it is true.
>
> MR. SCHULTE:  You know we're prosecuting the case, right?
>
> MR. BOOKER:  But before you were prosecuting, he got a deal.  He got a deal.  He will tell you.
>
> MS. WAGNER:  We have already had this argument as to whether or not the deal was at the time of this and the D.A.'s office, as well as the P.D.'s office, indicated that there was no consideration for this case for his testimony.
>
> MR. BOOKER:  They made a recommendation that he gets probation on a case … he is looking at 18 months.  A misdemeanor three case was continued for two years.  Every time we came, we went on side bar.  I can ask him if he got a benefit.
>
> MR. SCHULTE:  It was a misdemeanor?

MR. BOOKER:  It was a misdemeanor.

MR. SCHULTE:  Okay. Go ahead. Go ahead with your misdemeanor.

*Id.* at 114-15.

After the discussion at sidebar concluded, defense counsel asked Gregory about whether he recalled signing a letter of immunity from prosecution.  While Gregory testified that he signed a letter of immunity, when asked if it said that he could not be prosecuted for anything that he said at Appellant's trial, Gregory responded "not that [he knew] of" and stated that he "thought it was for a robbery that [he] had."[5]  *Id.* at 115-16. Appellant's defense counsel then moved on with his questioning.

On redirect examination, the following exchange occurred between Gregory and the prosecution:

> Q:  Now, you were asked on cross[-]examination about immunity.  Are you getting any deals out of testifying today?
>
> A.  No.
>
> Q.  Have I promised you anything or has anybody from the prosecution promised you anything for your testimony today?
>
> A. I am not getting anything from anybody.
>
> Q. You are not getting anything from anybody, right?
>
> A.  I am not getting no deals, I am not getting no help, I ain't getting nothing.

*Id.* at 122.  Indeed, when asked why he was providing his testimony, Gregory indicated that he could not "deal with" what he saw, that it kept replaying in his mind, and that it

---

[5] According to the trial court opinion filed in this matter, discussed *infra*, in response to subpoenas filed by Appellant in relation to his post-sentence motion, the Office of the Public Defender of Mercer County presented "an unsigned letter, dated April 1, 2015, which described an agreement that does not appear to relate to the present case."  Trial Court Opinion, 4/12/2018, at 10.  It is unclear whether this is the letter referred to herein. In any event, neither this letter, which is not in the record, nor any other offer of outright immunity is at issue before this Court.

haunted him.  *Id.* at 122-23.  Gregory also explained that his mother told him that if it would have happened to Gregory, "she would want to know the truth."  *Id.* at 122.

At the conclusion of trial, both defense counsel and the Commonwealth referenced Gregory's testimony in their closing arguments.  Defense counsel, for his part, repeatedly cast Gregory as a liar, but could not say what his motive was for lying.  *See, e.g.*, N.T., 8/25/2017, at 67 ("They will say what motive does John Gregory have to lie?  We don't know what is up with John Gregory."); *id.* at 68 ("And why would [Gregory] lie?  We don't know."); *id.* at 71-72 (characterizing Gregory as the prosecution's "star witness" and explaining "how incredible his story is," but that "[w]e don't know what his motive is").

The prosecution, in contrast, characterized Gregory as the "witness who told [the jury] the truth," stating to the jury:

> What did John Gregory tell you?  My mother told me that if anything like that ever happened to me, she would want to know the truth.  If anything like that ever happened to me, she would want to know the truth.  That should be ringing in your ears every time one of those cockamamie conspiracy theories came out of Mr. Booker's mouth.
>
> Why would he lie?  This man is John Gregory's life-long friend.  They are brothers.  They did everything together.  And he is the one that told you the truth.  He told you what happened in that room and it is because of those words that his mother told him.  If it happened to him, she would want to know what was the truth.  His conscience got the better of him.  Thankfully for [Victim] we know the truth, and that's because of John Gregory.
>
> John Gregory told you that [Victim] begged for his life as that man executed him.  And when he went for the door, when [Victim] went for the door, [Appellant], he grabbed him and threw him back in the middle of the kitchen and shot him some more.  So when Mr. Booker tells you about the duty to retreat and the victim is the one trying to retreat and you take him and you throw him back into the middle of the room and shoot him some more, ask yourself if that comports with this whole idea of duty to retreat.  He had an opportunity to retreat, but he took the opportunity to make sure that man was dead.

*Id.* at 85-86.

The prosecution also told the jury, "The one [witness] that matters told you the truth, and that's the actual witness to what happened and that is John Gregory." *Id.* at 100. The prosecution additionally mentioned details of the shooting relayed by Gregory in discussing the specific charges against Appellant. *See id.* at 100-103 (repeatedly referencing shooting someone and pulling that person back into the room as the person tried to leave to continue shooting that person, while that person was begging for his life).[6]

On August 25, 2017, the jury rendered its verdict finding Appellant guilty of first-degree murder. On August 29, 2017, Appellant filed a motion to transcribe Gregory's criminal proceeding transcripts, representing that "[o]n March 7, 2017 at case No.[] 314 of 2015, C.R. the defendant, John Gregory pled no conte[s]t before the Honorable Judge Christopher St. John and was sentenced on April 28, 2017." Defendant's Motion to Transcribe, 8/29/2017, at ¶ 2. Notwithstanding the repeated denials by both Gregory and the Commonwealth of the existence of any agreement for cooperation between the two, Appellant requested transcription of Gregory's proceedings as necessary for his appeal, and the trial court granted that request.[7] Thereafter, Appellant filed another motion to transcribe wherein he averred that he "learned that certain discoverable items were not provided during trial" and sought transcription of various pretrial proceedings in this matter. Defendant's Motion to Transcribe, 10/16/2017, at 2. This motion was also granted.

---

[6] It is also worth noting that, similar to its comments made during closing argument, the prosecution mentioned in its opening statement that Victim had begged for his life and that Appellant's "friends" would be telling the jury that Appellant was a killer. N.T., 8/21/2017, at 119-120, 123.

[7] The transcripts of these proceedings are not of record in this case. However, as evidenced by the transcript of the hearing on Appellant's post-sentence motion, those transcripts reveal that ADA Wenger agreed to Gregory's receipt of a probationary sentence in his underlying criminal case due in part to Gregory's "cooperation." N.T., 3/12/2018, at 48.

On October 30, 2017, Appellant was sentenced to life in prison without the possibility of parole. On November 9, 2017, Appellant filed a post-sentence motion, which was thereafter amended. Among the claims set forth therein, Appellant alleged that the Commonwealth engaged in prosecutorial misconduct by intentionally failing to disclose that Gregory received a benefit or consideration in exchange for his testimony in violation of *Brady*.

The trial court conducted a hearing on Appellant's motion. At the hearing, Assistant Public Defender Autumn Johnson, who had represented Gregory in his underlying criminal matter, appeared pursuant to a subpoena Appellant had served upon her. Appellant's defense counsel had Attorney Johnson read the following portion of the March 7, 2017, transcript from Gregory's underlying matter into the record:

> Mr. Wenger: … [A]t 314 Criminal 2015, it would be to the Information, that the Commonwealth has agreed to a probationary sentence, although that would be in the mitigated range of Mr. Gregory's guidelines. We have agreed to that based off of his cooperation as well as how he has turned his life around, it appears anyway, at least based on the acts he has done over the past year and a half.

N.T., 3/12/2018, at 21-22, 47-48. Critically, Attorney Johnson testified that the "cooperation" to which ADA Wenger referred was Gregory's cooperation in Appellant's case. In this regard, Attorney Johnson explained that Gregory's case was repeatedly continued in anticipation of Appellant's trial, that Gregory was going to cooperate against Appellant, and that Gregory received a mitigated rage sentence in exchange for Gregory's cooperation in Appellant's case, including for Gregory's anticipated cooperation at Appellant's trial. *Id.* at 46-49, 52.[8]

---

[8] Notably, upon questioning by Attorney Schulte at the hearing, Attorney Johnson relayed that she and Attorney Schulte had never met and had never talked about anything, including Appellant's or Gregory's cases, prior to the hearing. N.T., 3/12/2018, at 50.

Following the hearing, the trial court denied Appellant's post-sentence motion. In its accompanying opinion, the court observed that the DA's office had no documentation of an agreement to turn over to Appellant and that the only evidence of the agreement between Gregory and the DA's office was the transcript from Gregory's plea proceedings. Tr. Ct. Op. 4/12/2018, at 11. The trial court reasoned that, because Appellant could have obtained the transcript from those proceedings prior to Appellant's trial from sources other than the prosecution through the exercise of reasonable diligence, the Commonwealth did not commit a *Brady* violation by failing to turn over that transcript. *Id.* at 12.

Appellant appealed his judgment of sentence to the Superior Court. Appellant argued that, *inter alia*, the trial court erred in rejecting his claim that the Commonwealth committed a *Brady* violation by failing to disclose that Gregory received a mitigated sentence in his underlying criminal matter in exchange for his cooperation in this case.

In an unpublished memorandum, the Superior Court affirmed Appellant's judgment of sentence. *Commonwealth v. Bagnall*, 2019 WL 994169 (Pa. Super. filed March 1, 2019). The court rejected Appellant's *Brady* claim by first observing that, while it was the OAG who prosecuted Appellant, it was the DA's Office that prosecuted Gregory and agreed to him receiving a lesser sentence in his underlying case. The court reasoned that Appellant failed to demonstrate that the OAG was aware of the agreement at the time of Appellant's trial. The Superior Court also noted that there was no actual documentation of the agreement between Gregory and the DA's Office, and nothing in the entirety of the file forwarded to the OAG from the DA's Office that indicated an agreement existed.[9]

---

[9] On the latter point, the Superior Court cited Attorney Schulte's representations at the hearing on Appellant's post-sentence motion that, when a matter is transferred to the OAG from the DA's Office, as was the case here, the OAG requires that the DA's Office give the OAG "every single piece of paper" that they have on the matter. *Bagnall*, 2019 WL 994169 at *2 (quoting N.T., 3/12/18, at 75). Attorney Schulte further stated that he and Attorney Wagner went through "every single piece of paper that was sent to" them

Thus, according to the Superior Court, Appellant failed to demonstrate that the Commonwealth willingly withheld material evidence and that the evidence was in the exclusive control of the Commonwealth. Based on the foregoing, the Superior Court held that the trial court did not err in denying Appellant's *Brady* claim.

We granted discretionary review of this matter to determine whether the lower courts "erred in failing to grant a new trial based upon a serious *Brady* violation." *Commonwealth v. Bagnall*, 217 A.3d 806 (Pa. 2019) (*per curiam*). This issue presents a question of law, for which our standard of review is *de novo* and our scope of review is plenary. *Commonwealth v. Smith*, 131 A.3d 467, 472 (Pa. 2015).

Appellant submits that he has satisfied all of the requirements necessary to establish a meritorious *Brady* claim and that the courts below erred in several respects in reaching their contrary conclusion.[10] In particular, Appellant claims that the trial court and Superior Court improperly concluded that he failed to establish a *Brady* violation because there was no formal documentation of the agreement and Appellant could have obtained the transcript relating to Gregory's plea proceedings, which is the only evidence of the agreement and which was not in the exclusive possession of the Commonwealth, prior to trial upon the exercise of due diligence. Appellant also claims that the Superior Court erred to the extent that it concluded that the prosecution did not willingly withhold the information.

---

and that there was "not one piece of paper … that indicated that there was any type of agreement with John Gregory in exchange for his testimony in this case." *Id.* (quoting N.T., 3/12/18, at 75).

[10] This Court has observed that, to establish a *Brady* violation, a defendant has the burden to prove that: (1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it impeaches; (2) the prosecution has suppressed the evidence, either willfully or inadvertently; and (3) the evidence was material, meaning that prejudice must have ensued. *Commonwealth v. Chambers*, 807 A.2d 872, 887 (Pa. 2002); *Commonwealth v. Burke*, 781 A.2d 1136, 1141 (Pa. 2001).

Additionally, Appellant argues that the Superior Court improperly concluded that the prosecution did not commit a *Brady* violation on the basis that the OAG was unaware of the agreement. In this regard, Appellant asserts that the court failed to give proper consideration to precedent imposing constructive knowledge or possession of *Brady* material on a prosecutor. Appellant's Brief at 11-18 (citing, *inter alia*, *Giglio v. United States*, 405 U.S. 150, 154 (1972) (holding that a prosecutor's office is an entity and the spokesman for the government, and that a promise of leniency made by one attorney in the prosecutor's office must be attributed to the government), and *United States v. Risha*, 445 F.3d 298, 304 (3d Cir. 2006) (setting forth a test for determining whether to impose "cross-jurisdiction constructive knowledge" on a prosecutor, which includes considering "(1) whether the party with knowledge of the information is acting on the government's 'behalf' or is under its 'control'; (2) the extent to which state and federal governments are part of a 'team,' are participating in a 'joint investigation' or are sharing resources; and (3) whether the entity charged with constructive possession has 'ready access' to the evidence")).

The OAG counters that the lower courts correctly determined that Appellant has not established a *Brady* violation. In this regard, the OAG echoes the rationale of the courts below that Appellant's claim fails because the information sought was equally available to Appellant, and Appellant could have obtained the information elsewhere upon the exercise of due diligence. The OAG submits that Gregory's proceedings predated Appellant's trial by several months and that, as is evident from the record in this case, Appellant's defense counsel was well aware of the favorable outcome Gregory had received in his underlying case, that it was an area of inquiry potentially relevant to the defense, and how he could obtain documentation of it. The OAG argues that a meritorious *Brady* claim cannot arise from a situation wherein Appellant seeks to impose constructive

knowledge of information on the OAG when Appellant had actual knowledge of that information.[11]

The OAG also contends that, in seeking to impute knowledge of the cooperation agreement on the OAG under the circumstances of this case, Appellant cites no controlling authority supporting his position. The OAG argues that a prosecutor's disclosure obligation encompasses only information known or readily ascertainable by the government actors involved in the prosecution, and here, the DA's Office was no longer involved in Appellant's prosecution at the time of Gregory's plea and sentencing. OAG's Brief at 14 (citing, *inter alia*, *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (imposing on a prosecutor the "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"), and *Burke*, 781 A.2d at 1142 (observing that, "under *Kyles*, the prosecution's *Brady* obligation clearly extends to exculpatory evidence in the files of police agencies of the same government bringing the prosecution")). The OAG contends that, given that the two prosecutorial agencies involved in this case represent separate governments and the OAG only became involved in Appellant's case after the DA's Office had been disqualified, there is no valid basis upon which to attribute constructive knowledge known only to one member of the DA's office to the OAG in this case.

Having set forth the parties' arguments, we now turn to our discussion. It is well-settled that *Brady* and subsequent precedent flowing therefrom imposes upon a

---

[11] The OAG also advances an argument that the favorable resolution Gregory received in his underlying case was for the limited purposes of rewarding him for his prior consent to numerous continuances and getting the case off of the court calendar, and not an inducement for his future cooperation with the OAG in Appellant's case. OAG's Brief at 24-25 (relying upon N.T., 3/12/18, at 47, wherein Attorney Johnson stated that "after [Gregory's] case went on and on and on and the A.G.'s Office, [Appellant's case] was turned over to there, basically Mr. Wenger said to me, '[Appellant's case] is not my case anymore. I don't care what happens. I want this done.'").

prosecutor the obligation to disclose all favorable evidence that is material to the guilt or punishment of an accused, even in the absence of a specific request by the accused. *Commonwealth v. Strong*, 761 A.2d 1167, 1171 & n.5 (Pa. 2000). This Court has held that, to establish a *Brady* violation, a defendant has the burden to prove that: (1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it impeaches; (2) the prosecution has suppressed the evidence, either willfully or inadvertently; and (3) the evidence was material, meaning that prejudice must have ensued. *Chambers*, 807 A.2d at 887; *Burke*, 781 A.2d at 1141.

The alleged *Brady* material at issue in this matter consists of an agreement between Gregory and the DA's Office, pursuant to which Gregory received a mitigated sentence in his underlying criminal case in exchange for his cooperation in this case. On *Brady* claims involving this type of information, we have observed that "due process requires the jury to be informed of any promise or understanding that the government would extend leniency in exchange for a witness's testimony." *Commonwealth v. Chmiel,* 30 A.3d 1111, 1131 (Pa. 2011). Indeed, "[a]ny implication, promise or understanding that the government would extend leniency in exchange for a witness' testimony is relevant to the witness' credibility." *Strong*, 761 A.2d at 1171. Notably, we have further explained that the promise or "understanding between the prosecution and its testifying witness need not be in the form of a signed contract or a completed, ironclad agreement in order to qualify as *Brady* material," *Chmiel,* 30 A.3d at 1131, as impeachment evidence relating to "the credibility of a primary witness against the accused is critical evidence and it is material to the case whether that evidence is merely a promise or an understanding between the prosecution and the witness." *Strong*, 761 A.2d at 1175.

Applying this jurisprudence to the facts before us, we preliminarily address whether Appellant sufficiently established that an implication, promise, or understanding existed

between Gregory and the DA's Office whereby Gregory received a mitigated sentence in his underlying criminal matter in exchange for his cooperation in Appellant's prosecution. In doing so, we observe that the lower courts did not make any observations to the contrary and the OAG offers little argument to refute the existence of such an agreement. As noted, the only claim the OAG advances on the point is its contention that Gregory received a mitigated sentence only in exchange for his prior consent to multiple continuances of his case and in an effort to get Gregory's matter off of the court calendar, not for his future cooperation in Appellant's trial. *See supra* at page 15 n.11.

As set forth above, ADA Wenger explained that he was recommending a probationary sentence for Gregory in exchange for his "cooperation." *See* N.T., 3/12/2018, at 48. Further, Attorney Johnson testified that this "cooperation" specifically related to Gregory's assistance in Appellant's case, including Gregory's anticipated cooperation at Appellant's trial. *Id.* at 46-49, 52. Thus, we reject the OAG's position and conclude that the record establishes that the DA's Office agreed to extend leniency to Gregory in exchange for his cooperation in Appellant's prosecution.

We also conclude that, to the extent the lower courts rejected Appellant's claim on the basis that there was no formal documentation of the agreement to provide Appellant, they erred in so doing. As set forth above, formal documentation is not required in order for an agreement or understanding to qualify as *Brady* material. *See Strong*, 761 A.2d at 1171, 1175 (explaining that "[a]ny implication, promise or understanding that the government would extend leniency in exchange for a witness' testimony is relevant to the witness' credibility" and material to the case); *Chmiel*, 30 A.3d at 1131 (observing that a promise or "understanding between the prosecution and its testifying witness need not be in the form of a signed contract or a completed, ironclad agreement" to fall under *Brady*).

Thus, that there is no formal documentation evidencing the agreement between Gregory and the DA's Office is immaterial for purposes of a *Brady* analysis.

Having concluded that the record before us established the existence of a cooperation agreement and that the absence of any formal documentation does not defeat Appellant's claim, we further hold that the information withheld from Appellant was impeachment evidence that was material to Appellant's case, thus satisfying the first and third prongs of the *Brady* analysis set forth above. *See supra* at p. 13 n. 10; p. 16. Specifically, regarding materiality, this Court has explained that "impeachment evidence is material, and thus subject to obligatory disclosure, if there is a reasonable probability that had it been disclosed the outcome of the proceedings would have been different." *Strong*, 671 A.2d at 1174. In analyzing whether a defendant has demonstrated a reasonable probability of a different outcome, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. Stated differently, a defendant shows a "reasonable probability" of a different outcome when the government's suppression of evidence "undermines confidence in the outcome of the trial." *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

Gregory was the only eyewitness to the shooting, and his testimony was critical to the prosecution's case against Appellant and its theory that Appellant did not act in self-defense. *See, e.g.,* N.T., 8/22/2017, at 75 (Gregory's testimony that Victim did not have a gun at the time of the shooting, begged for his life, and tried to retreat, while Appellant repeatedly shot Victim and prevented him from leaving). Further, in relaying the details of Victim's murder, Gregory explicitly denied the existence of any agreement with the prosecution, indicating instead that he was motivated to testify against Appellant in light

of his mother's comments that she would want to know the truth if Gregory had been the victim and that the murder haunted him. *Id.* at 122-23. In light of these averments and in the absence of the jury's awareness of the agreement, the prosecution was able to bolster Gregory's credibility, while the defense was left without an effective means of impeachment. *Compare* N.T., 8/25/2017, 67-68; 71-72 (defense counsel, in attacking Gregory's credibility, stating that his motive for lying is unknown), *with id.* at 85-86, 100 (prosecution explaining that Gregory was the witness that mattered and that he told the truth).

Had Appellant been made aware of the agreement, he could have used it to impeach Gregory's credibility. Further, had the jury been made aware of the agreement, it would have been entitled to conclude that Gregory's testimony was provided in accordance with that agreement made with the DA's Office in exchange for his mitigated sentence. In light of the foregoing, we cannot say that in the absence of the agreement Appellant received a fair trial resulting in a verdict worthy of confidence. Accordingly, he has established that there is a reasonable probability that, had the agreement been disclosed, the outcome of the trial would have been different.

Having concluded that Appellant sufficiently proved that the information sought was favorable impeachment evidence that is material to his case, we address the issue of suppression, the second prong of the *Brady* analysis. *See supra* at p. 13, n. 10; p. 16. It is undisputed that neither the DA's Office nor the OAG disclosed the agreement to Appellant. This notwithstanding, the OAG argues, and the courts below concluded, that the prosecution's failures in this regard were excused because: (1) the OAG actually prosecuted Appellant at trial and was unaware of the agreement, (2) Appellant did not prove that the prosecution willfully withheld the information, and (3) the information was not in the exclusive possession of the prosecution because Appellant could have obtained

it from other sources upon the exercise of due diligence. For the reasons that follow, we conclude that none of these bases can serve to defeat Appellant's *Brady* claim.

Regarding the OAG's lack of awareness of the agreement, we begin with a discussion of the United States Supreme Court's decision in *Giglio*. In that case, Robert Taliento confessed to authorities that he and John Giglio engaged in a scheme forging and processing money orders from a bank at which Taliento was a teller. Taliento eventually related this story to a grand jury, which indicted Giglio. Taliento was subsequently named as a coconspirator but was not indicted. *Giglio*, 405 U.S. at 151.

At Giglio's subsequent trial held two years later, Taliento testified as the only witness linking Giglio to the crime and identifying him as the instigator of the scheme. While Giglio's defense counsel sought to discredit Taliento by revealing possible agreements for prosecutorial leniency, Taliento denied the existence of any agreement with the prosecution, which also indicated that Taliento received no promises that he would be not be indicted. Giglio was convicted of passing forged money orders and sentenced to five years of imprisonment. *Id.* at 150-52.

While Giglio's appeal was pending, his defense counsel discovered new evidence indicating that the government had failed to disclose an alleged promise made to Taliento that he would not be prosecuted if he testified on the government's behalf. Giglio filed a motion for a new trial based on the newly discovered evidence. In opposition to the motion, the Government filed affidavits wherein it was revealed that United States Attorney DiPaola, who had presented the government's case to the grand jury, had promised Taliento that he would not be prosecuted if he testified before the grand jury. However, United States Attorney Golden, who had taken over the matter for trial, stated that Attorney DiPaola assured him before trial that no promises of immunity had been made to Taliento. A third United States Attorney, Attorney Hoey, stated that he had

told Taliento and his attorney shortly before trial that Taliento would be prosecuted if he did not testify and that, if he did testify, he would have to rely on the government's judgment regarding whether he would be prosecuted. *Id.* at 150, 152-53.

Finding the conflicting accounts between the attorneys to be of no moment, the High Court explained that at the heart of the matter was the fact that one government attorney had stated that he promised Taliento that he would not be prosecuted if he cooperated with the government. The High Court concluded that the nondisclosure of this promise violated Giglio's due process rights. In doing so, it explained that "neither DiPaola's authority nor his failure to inform his superiors or his associates is controlling." *Id.* at 154. The Court further explained that, "whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor. The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government." *Id.* While the Court acknowledged the burden its holding could place on the prosecution, it explained that "procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it." *Id.*

Following *Giglio*, the High Court decided *Kyles*, where it rejected the argument that *Brady* does not apply to evidence "known only to police investigators and not to the prosecutor." *Kyles*, 514 U.S. at 438. The Court explained that to hold otherwise would "amount to a serious change of course from the *Brady* line of cases." *Id.* While it acknowledged that police investigators at times fail to inform a prosecutor of everything they know, the Court relied on *Giglio*'s observation that "procedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it." *Id.* (quoting *Giglio*,

405 U.S. at 154). The *Kyles* Court continued by explaining that, since "the prosecutor has the means to discharge the government's *Brady* responsibility[,] … any argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials." *Id.* The Court thus imposed upon a prosecutor the "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Id.* at 437.

As the foregoing illuminates, knowledge of promises of leniency by one attorney in a prosecutor's office are attributable to all attorneys in that same office, *Giglio*, and knowledge of favorable evidence known to others acting on the government's behalf in a case will be imputed to the governmental body conducting the prosecution, *Kyles*. Indeed, this Court has recognized the import of these holdings. For example, in *Commonwealth v. Hallowell*, 383 A.2d 909 (Pa. 1978), the Court relied upon *Giglio* to hold that "where the prosecution fails to correct a witness's testimony at trial denying offers of leniency, when in fact such offers had been made, rudimentary demands of justice dictate that a defendant's conviction be reversed and a new trial granted," irrespective of whether the trial prosecutor was actually aware of those offers. *Id.* at 911. In doing so, we emphasized that "[p]romises of leniency by an assistant district attorney are attributed to the office of the district attorney as an entity." *Id.*

Further, in *Burke*, this Court observed that, "under *Kyles*, the prosecution's *Brady* obligation clearly extends to exculpatory evidence in the files of police agencies of the same government bringing the prosecution." *Burke*, 781 A.2d at 1142; *see also Commonwealth v. Miller*, 987 A.2d 638, 656 (Pa. 2009) (explaining that *Kyles* imposed a duty on the prosecution "to provide the defense with exculpatory evidence contained in the files of police agencies of the same government bringing the prosecution, even though

the prosecution was unaware of the existence of the evidence," and that its holding was limited to "those agencies that were involved in the prosecution of the accused"). Notably, this Court in *Burke* continued by explaining that, to the extent that Rule 305(B) (now Rule 573(B)), *see supra* at page 3 n.3, "and the cases construing it could be read to suggest otherwise, such readings must bow to *Kyles'* elaboration of the prosecutor's *Brady* duty respecting exculpatory evidence." *Burke*, 781 A.2d at 1142.

After a review of *Giglio* and *Kyles*, and particularly the rationale underpinning those decisions, we have no hesitation in extending their holdings to the specific circumstances before us and imputing knowledge of the agreement onto the OAG, where the OAG assumed prosecution of Appellant from the DA's Office and was not made aware of the agreement between the DA's Office and Gregory. As stated above, a "prosecutor's office … is the spokesman for the Government," and a promise of leniency "made by one attorney must be attributed … to the Government" in determining whether its nondisclosure violates a defendant's due process rights. *Giglio*, 405 U.S. at 154. That the role of spokesman in this case was initially filled by the DA's Office and later by the OAG is of no moment, as the DA's Office was clearly involved in the prosecution of Appellant and, thus, the OAG's *Brady* obligation extends to exculpatory evidence known to the DA's Office. *See Kyles*; *Burke*; *Miller*. As the High Court made clear in *Giglio*, to the extent this rule places a burden on prosecution offices, policies and procedures can be implemented to stem any violations of the rule we set forth today and "insure

communication of all relevant information on each case to every lawyer who deals with it." *Giglio*, 405 U.S. at 154.[12,13]

Having determined that the OAG should be deemed to have knowledge of the cooperation agreement between Gregory and the DA's Office in this matter, we further respectfully conclude that the Superior Court erred to the extent that it rejected Appellant's claim on the basis that he failed to prove that the prosecution "willingly withheld" the information at issue. *Bagnall*, 2019 WL 994169 at *3. As noted, in proving a *Brady* violation, a defendant must establish that the prosecution suppressed the evidence at issue, whether willfully or inadvertently. This Court has observed that "the good faith, or lack thereof, by the prosecutor is not determinative because the concern is not punishment of society for misdeeds of the prosecutor, but avoidance of an unfair trial to the accused--it is the effect on the right to a fair trial, not the prosecutor's state of mind, that constitutes reversible error." *Commonwealth v. Wallace*, 455 A.2d 1187, 1190 (Pa.

---

[12] Indeed, it appears that the OAG had a policy of requesting the entire case file of the DA's Office upon assuming prosecution of a case transferred from the DA's Office. *See supra* at pages 12-13 n.9.

[13] Appellant dedicates much of his brief to a discussion of the three-pronged test for imputing "cross-jurisdiction constructive knowledge" on a prosecutor as set forth by the Third Circuit Court of Appeals in *Risha*. *See Risha*, 445 F.3d at 304 (explaining that, in determining whether to impose "cross-jurisdiction constructive knowledge" on a prosecutor, a court should consider "(1) whether the party with knowledge of the information is acting on the government's 'behalf' or is under its 'control'; (2) the extent to which state and federal governments are part of a 'team,' are participating in a 'joint investigation' or are sharing resources; and (3) whether the entity charged with constructive possession has 'ready access' to the evidence").

We need not decide whether to adopt the *Risha* test as that case is factually distinguishable. *Risha* concerned the federal prosecution of Jesse James Risha and whether it was proper to impute to the federal prosecutor knowledge of state agents that a key witness who testified against Risha expected leniency regarding unrelated state charges in return for his cooperation in Risha's case. Unlike the instant case, the facts of *Risha* did not include a transfer of Risha's prosecution between the different prosecutorial entities involved.

1983). Thus, whether the prosecution acted willfully in failing to disclose the agreement is irrelevant for purposes of a *Brady* analysis.

Finally, the lower courts and the OAG take the position that Appellant's *Brady* claim fails because he could have obtained the information elsewhere, particularly in the transcript of Gregory's plea proceedings, upon the exercise of due diligence. We acknowledge that "no *Brady* violation occurs where the parties had equal access to the information or if the defendant knew or could have uncovered such evidence with reasonable diligence." *Commonwealth v. Morris*, 822 A.2d 684, 696 (Pa. 2003). Additionally, we have observed that "publicly available transcripts of court proceedings are not *Brady* material." *Commonwealth v. Maisonet*, 31 A.3d 689, 697 (Pa. 2011). However, under the circumstances of this case, we decline to hold that these pronouncements and the availability of transcripts from Gregory's criminal matter operate to defeat Appellant's claim.

On three separate occasions prior to Appellant's trial, Appellant requested information relating to any consideration Gregory was receiving in exchange for his cooperation in this matter. All of these requests were met with repeated denials by the prosecution, including one denial issued by the OAG months after the agreement was evidenced in Gregory's plea proceedings. Notwithstanding these denials, Appellant's defense counsel attempted to reveal potential arrangements for leniency at trial, with both the OAG and Gregory again denying that Gregory received any consideration in exchange for his cooperation in Appellant's case.

Notwithstanding the prosecution and Gregory repeatedly denied the existence of any deal made in exchange for Gregory's cooperation in this case, Appellant sought transcription of Gregory's plea proceedings following Appellant's trial. While this transcript referenced ADA Wenger's agreement to a probationary sentence in light of

Gregory's "cooperation," it did not reveal any details of that arrangement or its relation to Appellant's case. In light of the transcript's ambiguous reference, Appellant subpoenaed Attorney Johnson, Gregory's defense counsel in that criminal matter, in an effort to resolve the ambiguity at the hearing on Appellant's post-sentence motions. It was at that hearing that it was definitively revealed for the first time that Gregory in fact received consideration for his cooperation in Appellant's case in the form of a mitigated sentence in his case.

Based on the foregoing, we respectfully reject the OAG's position and the rationale of the courts below insofar as they indicate that Appellant either knew or could have obtained evidence of the agreement through transcripts of Gregory's plea proceeding prior to trial upon the exercise of due diligence. This is not a case where the parties had equal access to the information at issue. Further, we find the ambiguous reference to Gregory's "cooperation" in the plea proceeding, which was the only documentation of the agreement, in and of itself, to be insufficient to constitute an independent source establishing the existence of the specific agreement between the DA's Office and Gregory relating to Gregory's cooperation in Appellant's murder prosecution.

Albeit in other contexts, this Court has explained that whether due diligence has been exercised is a fact-specific inquiry determined on a case-by-case basis; it "does not require perfect vigilance and punctilious care, but merely a showing [that the party] has put forth a reasonable effort to obtain the information upon which a claim is based." *Commonwealth v. Cox*, 146 A.3d 221, 230 (Pa. 2016) (setting forth this explanation of due diligence in the context of a timeliness issue under the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541-9546) (internal quotation marks omitted); *Commonwealth v. Selenski*, 994 A.2d 1083, 1089 (Pa. 2010) (explaining this standard in the context of a speedy trial case). Due diligence does not require Appellant to assume that the prosecution and

Gregory were untruthful.  In any event, Appellant's efforts in attempting to uncover the existence of the agreement in the face of repeated denials by the prosecution and Gregory, as well as the ambiguous reference to Gregory's "cooperation" in his plea proceeding transcript, were more than reasonable.

For the reasons stated above, Appellant has established a meritorious claim that the prosecution in this matter committed a *Brady* violation in failing to disclose the cooperation agreement made between the DA's Office and Gregory, a key witness in Appellant's trial.  Accordingly, we reverse the judgment of the Superior Court and remand the matter for a new trial.

Chief Justice Saylor and Justices Todd, Donohue, Dougherty, Wecht and Mundy join the opinion.